FALIU LUALEMANA on behalf of Lualemana Family
of Asu, Plaintiff

v.

MR. BROWN of Mesepa, Defendant

GALOIA UPUESE and PAOGOFIE S. in behalf of
the people of Pavaiai, Intervenors

No. 12-1958

High Court of American Samoa

Civil Jurisdiction, Trial Division

July 3, 1958

Heard at Fagatogo on June 5, 1958 before MORROW, *Chief Judge*, and MALEPEAI and TAUALA, *Associate Judges*.

Aumoeualego for the plaintiff.

Moananu for the defendant.

Lauvao for the intervenors.

OPINION OF THE COURT

MORROW, *Chief Judge*.

On March 19, 1958 plaintiff Faliu Lualemana acting in behalf of the Lualemana Family of Asu filed his petition

349

praying for an order restraining defendant Brown from removing cinders from a cinder pit claimed by the plaintiff to be on communal family land of the Lualemana Family of Asu. Defendant Brown claimed the right to remove the cinders pursuant to permission granted him by the chiefs of Aoloau speaking through Moananu. Plaintiff in his petition alleged that defendant Brown had taken cinders from the pit on Feb. 4, 1958 and again on Mar. 17, 1958 without the consent of the plaintiff. The cinders are volcanic ash deposited in an eruption of a volcano.

Prior to the hearing the Court viewed the land in the presence of the plaintiff, the defendant, their respective counsel, and the intervenors. During the viewing the intervenors were authorized by the Court to file a petition of intervention, which they did claiming that the cinder pit was on land belonging to the people of Pavaiai.

It is common knowledge and an historical fact of which we will take judicial notice that shortly after the war—it was in 1946—that the villages of Aoloau and Asu were moved from their respective locations by the sea to Mt. Olotele. "Judicial notice may be taken of facts of local history which are of general knowledge." 31 Corpus Juris Secundum 638. It appeared from the evidence that when the move was made the chiefs of both villages held a fono at which it was agreed that the land to be occupied by the people of the two villages should be divided between the Aoloau people and the Asu people and that a road was to be built by the people of both villages which would be the boundary between them, the Aoloau people to have the land above the road and the Asu people the land below the road. The road was built. The Asu people proceeded to clear from the bush the land assigned to them by the agreement and to build houses and put in plantations on it. The Aoloau people did likewise with the land assigned to them. Part of the road was very steep and very difficult to use.

Some years later the villages constructed a new road to replace the very steep part of the old road, the new road being connected at both ends with the old road. The very steep part of the old road ceased to be used for highway purposes, it being replaced by the new road which ran through part of the area assigned to the Asu people by the aforementioned agreement.

When the new road was constructed a cinder pit which adjoins it on the upper side was opened up. It was from this cinder pit that defendant Brown took the cinders pursuant to permission granted him by the chiefs of Aoloau, they claiming that the pit was on land belonging to the Aoloau people.

At the viewing of the land involved High Talking Chief Moananu of Aoloau while standing on the old road to the rear of the cinder pit, told the court in the presence of the interested parties and their counsel that the old road was the agreed boundary line between the new villages of Aoloau and Asu. The evidence at the hearing, though slightly conflicting on this point, fully sustained Moananu's statement at the viewing. Of course the construction of the new road, connecting it up at the ends with the old road that belonged to the Asu people before the new road was constructed, still belonged to them and the land above the old road still belonged to the Aoloau people. The land between the old road and the new road was still Asu land. After the new road was constructed some Aoloau people put in a banana plantation on the land between the old road and the new. When High Chief Lualemana of Asu learned of this he had the banana plants pulled up and put in a plantation of his own in their place. It was later agreed between the Asu people and the Aoloau people that Lualemana had the right to have his plantation there because it was still Asu land. It was also later agreed between the villages that some Aoloau people who had put in plantations below the

road on the Asu side should vacate them in favor of the Asu people.

With respect to the claim of the intervenors that the land in which the cinder pit is is Pavaiai land, it need only be stated that their witness Paogofie S. (he was one of the intervenors) testified that both the new villages, i.e. Asu Fou and Aoloau Fou, were on Lualemana land. That was just another way of saying that they were not on the Pavaiai people's land. Also, while on the stand, he was asked what particular Pavaiai chief owned the land. He answered that it did not belong to any particular chief, but to Pavaiai Village—i.e. it was the communal property of the entire village. He also testified that the Pavaiai people had never had any plantation at the cinder pit location, but that in the past before the war some of the Pavaiai people had gotten some asi and papaogo trees from that general area for use in putting up houses in their village. This must have been on rather rare occasions since the population of Pavaiai before the war was so small that only occasionally was a fale put up.

█ The taking of a tree occasionally for constructing a house did not constitute taking possession of the general area where the trees were cut (assuming they were cut) nor did it constitute occupation of the premises. This court has ruled many times that Samoans acquired title to their lands through first occupancy coupled with a claim of ownership. See *Fagafa of Alofau v. Toia of Alofau*, No. 18-1957 (H.C. of Am. S.); *Soliai v. Lagafua*, No. 5-1949 (H.C. of Am. S.); *Faatiliga v. Fano*, No. 80-1948 (H.C. of Am. S.). See also 2 Blackstone 8; Maine's Ancient Law (3rd Am. Ed.) 238. In the Fagafa case just cited we said "Samoan families acquired title to their lands through first occupancy coupled with a claim of ownership." If prior to the war a Pavaiai chief and his family had cleared from the bush the land where the cinder pit is located and put in

352

plantations on it (as did the Lualemana people after the war) and claimed it as the communal property of the family it would have been that family's communal property, but such was not the case. There was no occupancy or possession by the Pavaiai people but only an occasional visit to the bush there to get a tree for use in putting up a fale. The Pavaiai people did not clear the land from bush but only took an occasional tree; nor did they, as we have previously indicated from the testimony of Paogofie, put in any plantation where the cinder pit is as did the Lualemana people.

The weight of evidence is to the effect that the Lualemana people were the first to clear from the bush the land on which the cinder pit is located, put in plantations thereon, occupy it, and claim it as their own.

We conclude, therefore, that the cinder pit is on the communal land of the Lualemana Family of Asu Fou. It follows, therefore, that defendant Brown had no right to take cinders from the pit pursuant to permission from the chiefs of Aoloau Fou.

However, it is clear to us from the evidence that Brown, who came from the States quite recently to build the new Mormon Mission School at Mapusaga, acted in entire good faith when he took the cinders to use in the construction of the new school buildings. That he honestly believed that he had the right to take them, relying upon the permission given him by the Aoloau chiefs, was very apparent to the Court during the hearing. We are convinced that it was an honest error on Brown's part.

██ Plaintiff, as we have said, has complained of only two trespasses in his petition in behalf of the Lualemana Family, one on February 4, 1958 and the other on March 17, 1958. It is our belief from the evidence that there is no danger that these trespasses will be repeated; nor is there any threat that they will be repeated. The issuance of an

injunction in a case of this kind is discretionary with the court. "Injunctive relief is not a matter of right, but its grant or refusal usually rests in the sound discretion of the court, exercised in harmony with well established principles." 43 Corpus Juris Secundum 420. "The courts draw a distinction between mere temporary trespasses and those of a continuing or recurring nature. For the former, the remedy at law is usually adequate and will preclude injunction; whereas the injury from repeated or continuing trespasses is generally irreparable, in the sense that money compensation recoverable in legal actions will not fully remedy the wrong done, and any attempt to obtain relief at law would not only entail considerable expense in proportion to the benefits received, but would necessitate a multiplicity of suits, which is both a grievance to the parties and a burden to the public. Accordingly, continuing and repeated trespasses will generally be restrained where, from the pleadings and the facts, the court is satisfied that the injury caused thereby is otherwise irreparable, particularly where such continuing and repeated trespasses are not only negligent, but also wilful." 28 American Jurisprudence 326. The trespasses complained of in this case were not continuing, and, as we have said, we believe from the evidence that they will not be repeated in the future. We think, as previously indicated, that Brown acted in entire good faith in taking the cinders on the two dates mentioned but that he has no intention of taking any more cinders from the pit, unless, of course, Lualemana should give him permission to do so, in which case the taking would not be a trespass.

It is fundamental that an injunction will not lie to restrain one from doing what he is not attempting and does not intend to do. 43 Corpus Juris Secundum 436. And an "Injunction will not issue in the absence of an actual or presently threatened interference; it is not sufficient

354

ground for an injunction that the injurious acts may possibly be committed or that injury may possibly result from the acts sought to be prevented; but there must be at least a reasonable probability that the injury will be done if no injunction is granted, and not a mere fear or apprehension, since injunctions will not be granted merely to allay the fears and apprehensions of individuals, which, it has been said, may exist without substantial reasons and be absolutely groundless." 43 Corpus Juris Secundum 436–438.

Since it is our conclusion from the evidence that repeated trespasses by Brown are neither threatened nor intended, it follows that the injunction prayed for by the plaintiff should be denied.

## ORDER

Accordingly, it is ORDERED that the plaintiff's petition for an injunction against the defendant Brown be and the same is hereby dismissed.

In view of all the facts in this case we consider it consistent with justice that the costs amounting to $25.00 be divided equally among the plaintiff, the defendant, and the intervenors. Accordingly, costs in the sum of $8.33 are hereby assessed against plaintiff Faliu Lualemana, a like sum against defendant Brown, and $8.34 against Galoia Upuese and Paogofie S., the intervenors. All costs to be paid within 30 days.